385 S.C. 364 (2009)
684 S.E.2d 199
U.S. BANK TRUST NATIONAL ASSOCIATION, f/k/a First Trust National Association, First Bank, National Association, as trustee under the Pooling Servicing Forbearance Agreement dated as of May 1, 1997, Morgan Stanley Capital, Inc. Mortgage Pass Certificates, Weighted Average Coupon Pass-Through Series 1997-pl, 180 East Fifth Street, St. Paul, MN 55101, Appellant,
v.
Clifford E. BELL, Jr., Delores Jane Bell a/k/a Delores J. Bell a/k/a Delores Jane R. Bell, Ford Consumer Financing Co., Inc., Henry I. Ziesel & Ziesel Accura Machinery Corporation, NationsBank, N.A. successor to Boatmens Bank of South Central Illinois, Pressmation, Inc., Daryl Palbiak, Phillip Dyches, South Carolina Department of Revenue, and The Department of TreasuryInternal Revenue Service, Respondents.
No. 4614.
Court of Appeals of South Carolina.
Heard April 23, 2009.
Decided August 31, 2009.
Rehearing Denied November 2, 2009.
*367 Hamilton Osborne, Jr., James Y. Becker, and Emily H. Farr, all of Columbia, for Appellant.
*368 Herbert W. Hamilton and Tracy T. Vann, both of Rock Hill, for Respondents.
PIEPER, J.
U.S. Bank Trust National Association (Bank) appeals the decision of the master-in-equity denying Bank's request for foreclosure. Bank further appeals the order restructuring the loan given to Delores and Clifford E. Bell (the Bells). We reverse and remand.

FACTS
In 2001, Bank commenced a foreclosure action against the Bells' property, resulting in a judgment of foreclosure dated July 17, 2002. On August 2, 2002, the day before the scheduled foreclosure sale, the Bells called Chase Home Finance, LLC (Chase), the servicing agent for Bank, and spoke with Anita Gaines (now known as Anita Stokes). Stokes was a foreclosure analyst for Chase. During the telephone conversation, the Bells negotiated with Stokes to stop the foreclosure sale and to reinstate the loan by entering into a payment agreement. The parties do not dispute the existence of the reinstatement agreement; they dispute the due date of the second lump sum payment under that agreement.
Under the reinstatement agreement, the Bells agreed to pay two lump sum payments totaling $67,570.85, and also agreed to begin monthly payments. Stokes testified the first payment of $30,000 was to be paid immediately upon execution of the reinstatement agreement and the remaining balance was to be paid ninety days from the entry of the reinstatement agreement, which was November 2, 2002. Stokes further testified she did not have the authority to extend the time for payment beyond ninety days. On the other hand, the Bells testified the agreement required the initial payment indicated and also required a second payment of $37,570.85 to be paid within twelve months from the entry of the reinstatement agreement.
Stokes stated she did not presently know the whereabouts of the document containing the reinstatement agreement; Bank did not produce the document at trial. Stokes claimed she placed the document containing the agreement in the *369 Bells' file and at some point transferred the file to Joseph Bryan. According to Stokes, Bryan gave the file to his manager, who unexpectedly died, resulting in the document's misplacement.
Around the time the reinstatement agreement was reached, Stokes made a record referencing the agreement in a computerized recordkeeping database known as FORTRACS History Notes.[1] The FORTRACS notes were introduced into the record as evidence without objection. Stokes' note provided, in pertinent part:
I spoke to [Mr. Bell] and he stated that there was an error in the e-mail that I had received. He is asking to pay thirty thousand dollars now and have the remainder of the money in ninety days. He'll be paying his regular payment of $2,134.52 for the months of September and October. November 2, 2002[,] he will have the remainder of the reinstatement funds, attorney fees[,] and cost.
Stokes testified she reduced the agreement to writing and sent it to the Bells via e-mail. Stokes asserted she later called the Bells, whereby they allegedly agreed to the terms, signed the document, and returned it to Stokes by facsimile. The Bells testified they had no notes or other documents to support their assertion that the second lump sum payment was due in August 2003.
On August 12, 2002, the Bells made the first payment of $30,000, which Bank accepted and eventually applied to the loan. Additionally, the regular monthly payments the Bells agreed to continue making were received in September, October, and November.
On November 1, 2002, after the initial monthly payments had been made, Stokes indicated she spoke with Mr. Bell. The note of her conversation provides, "[s]poke to Mr. Bell . . . he would be sending the rest of the reinstatement funds by 11/15/2002 [totaling $39,196.31]." On November 26, 2002, Stokes noted she again spoke with Mr. Bell and he stated his *370 check was being held up, but promised it would arrive on December 5, 2002. The note continues, "[h]e will [overnight] a check to us on 12/7/2002." Stokes testified the delay was allegedly due to the fact Mr. Bell was expecting some of his merchandise to be sold.
Stokes testified the Bells did not make the payment allegedly due by December 7, 2002. Stokes claimed she proceeded to call the Bells on two separate occasions (December 18, 2002, and January 16, 2003), leaving voice messages each time. Stokes also testified the Bells failed to make the monthly payments for December 2002 and January 2003. Stokes stated that on January 18, 2003, Mr. Bell claimed he sent in the December and January monthly payments; however, there were no records the payments were received. Moreover, the Bells never presented any documents or other evidence as to these missed monthly payments. During the same telephone conversation on January 18, 2003, Stokes also mentioned to Mr. Bell that she "would be getting all the funds posted to his account and sent out a new referral to start a new foreclosure action unless he can reinstate his account." Notwithstanding, Stokes entered a note in FORTRACS indicating the Bells' loan was fully reinstated as of February 7, 2003; Stokes subsequently testified as to the reason for the notation.
Bank renewed its foreclosure action in May 2003. On June 30, 2003, Bank filed an amended complaint. In the amended complaint, Bank alleged the amount due and owing on the promissory note (the Note) and mortgage was $233,386.37 plus interest at a rate of nine percent per annum from July 1, 2001, plus attorney's fees and costs. The Bells denied this allegation. Additionally, the Bells testified they did not tender the second lump sum payment by August 2003 because Bank had already renewed its foreclosure action and because Bank was returning the Bells' monthly mortgage checks.
The Bells' answer to the foreclosure action asserted several defenses and two counterclaims, one for breach of contract and the other for promissory estoppel.[2] The Bells admitted *371 they executed the Note in the original principal amount of $243,200.00 and a mortgage securing the Note, constituting a lien on the property.
Mr. Bell testified Bank started returning the monthly payments in February 2003, citing insufficient funds to cure default. Mr. Bell further testified the Bells continued to make payments every month thereafter until filing for bankruptcy protection in October 2005, despite Bank's rejection of the monthly payments.[3] While asserting he continued to make monthly payments until October 2005, Bell never tendered the second lump sum payment even by the date he contends it was due.
On October 15, 2005, Mr. Bell declared Chapter 7 bankruptcy, and notice of the bankruptcy was filed in Bank's foreclosure action against Mr. Bell on December 19, 2005. On October 19, 2006, Bank and the bankruptcy trustee settled Mr. Bell's interest in the counterclaims asserted against the Bank in the state court foreclosure action.[4] After Mr. Bell's bankruptcy case was closed, the foreclosure action was restored to the active docket on March 28, 2007, pursuant to Bank's motion under Rule 40(j), SCRCP.
The master-in-equity for York County presided over the nonjury trial in the foreclosure action. In his final order, the master-in-equity refused to allow the foreclosure to proceed because Bank had failed to carry its burden of proving that the terms of the reinstatement agreement required the second lump sum payment to be made in November 2002. In support of the decision, the master-in-equity cited Bank's own annotation that the loan was fully reinstated as of February 2003. Additionally, due to Bank's alleged repudiation of the agreement and subsequent rejection of Mr. Bell's monthly payment checks, the master-in-equity determined the Bells were not required to continue making payments to Bank because they *372 were not required to perform useless acts. Finally, the master-in-equity modified the Note by adding the accrued, but unpaid interest, and the escrow funds to the principal balance, resulting in a new balance of $394,550.99. The net effect of this remedy was to increase the outstanding principal balance. The master-in-equity allowed the Bells to repay the new principal balance with interest at the rate set forth in the Note[5] in monthly installments over the remaining term of the loan.[6]
The Bells filed a motion pursuant to Rule 59(e), SCRCP, wherein they asserted the following: (1) the award of accrued interest on payments which were made by the Bells and rejected by Bank was not supported by the evidence or applicable authority; (2) because Bank's rejection of the Bells' payments was wrongful, increasing the Bells' payments by $2,000 per month over the payment required by the original Note was not supported by the record; (3) the finding that Mr. Bell admitted to missing the December 2002 and the January 2003 payments was not supported by the record; and (4) the amount of the escrow balance was not supported by the record. In response, the master-in-equity entered a supplemental order.[7] In this order, the master-in-equity found Bank was not entitled to the accrued interest of $126,080.68 added to the principal balance. Notwithstanding, the master-in-equity added the second lump sum payment of $37,570.85 to the principal because the Bells did not make this payment as required by the reinstatement agreement. The net effect of these adjustments was to reduce the outstanding principal *373 balance to $306,041.16 and to reduce the monthly payment from $3,629.79 to $2,815.52. This appeal followed.

ISSUES ON APPEAL
I. Did the master-in-equity err in ruling Bank had not proven the Bells were in default on their loan?
II. Did the master-in-equity err in restructuring the loan and modifying the terms of payment without the consent of Bank?
III. Did the master-in-equity err in ruling Bank was not entitled to collect interest accrued on the loan?
IV. Did the master-in-equity err in ruling Bank was not entitled to recover attorney's fees incurred in attempting to collect the loan?

STANDARD OF REVIEW
"A mortgage foreclosure is an action in equity." Hayne Fed. Credit Union v. Bailey, 327 S.C. 242, 248, 489 S.E.2d 472, 475 (1997). In an appeal from an action in equity, tried by a judge alone, we may find facts in accordance with our own view of the preponderance of the evidence.[8]Low-country Open Land Trust v. Charleston S. Univ., 376 S.C. 399, 407, 656 S.E.2d 775, 779 (Ct.App.2008). "However, this broad scope of review does not require an appellate court to disregard the findings below or ignore the fact that the trial judge is in the better position to assess the credibility of the witnesses." Pinckney v. Warren, 344 S.C. 382, 387, 544 S.E.2d 620, 623 (2001). "Moreover, the appellant is not relieved of his burden of convincing the appellate court the trial judge committed error in his findings." Id. at 387-88, 544 S.E.2d at 623.
Additionally, "[a] legal question in an equity case receives review as in law." Sloan v. Greenville County, 356 S.C. 531, 546, 590 S.E.2d 338, 346 (Ct.App.2003). Because questions of law may be decided with no particular deference to the trial court, this court may correct errors of law in both legal and equitable actions. I'On, LLC v. Town of Mt. Pleasant, 338 *374 S.C. 406, 411, 526 S.E.2d 716, 719 (2000) (citing S.C.Code Ann. § 14-8-200 (Supp.1998)).

DISCUSSION
Bank first asserts the master-in-equity erred in ruling Bank had failed to prove the Bells were in default on their loan. We agree.
A mortgage and a note are separate securities for the same debt, and a mortgagee who has a note and a mortgage to secure a debt has the option to either bring an action on the note or to pursue a foreclosure action. Lever v. Lighting Galleries, Inc., 374 S.C. 30, 33, 647 S.E.2d 214, 216 (2007). Any modification of a written contract must satisfy all fundamental elements of a valid contract in order for it to be enforceable, including a meeting of the minds between the parties with regard to all essential terms of the agreement. Player v. Chandler, 299 S.C. 101, 104-05, 382 S.E.2d 891, 893 (1989). Thus, "[w]hile a written contract can be orally modified, there must be a meeting of the minds as to the modification." First Union Mortgage Corp. v. Thomas, 317 S.C. 63, 70, 451 S.E.2d 907, 912 (Ct.App.1994).
Here, the existence of the reinstatement agreement is undisputed; instead, the parties dispute when the second lump sum payment was due. When interpreting an oral contract, a court must give effect to the intentions of the parties. Keith v. River Consulting, Inc., 365 S.C. 500, 506, 618 S.E.2d 302, 305 (Ct.App.2005) (citing Columbia E. Assoc. v. Bi-Lo, Inc., 299 S.C. 515, 519, 386 S.E.2d 259, 261 (1989)). The determination of the parties' intent is a question of fact. S. Atl. Fin. Servs., Inc. v. Middleton, 349 S.C. 77, 81, 562 S.E.2d 482, 485 (Ct.App.2002). To give effect to the parties' intentions, the court will endeavor to determine the situation of the parties and their purposes at the time the contract was entered. Keith, 365 S.C. at 506, 618 S.E.2d at 305 (quoting Columbia E. Assoc., 299 S.C. at 519, 386 S.E.2d at 261). When a contract is silent as to a particular matter, parol evidence is admissible to reveal the intent of the parties. Id.
Generally, the party seeking foreclosure has the burden of establishing the existence of the debt and the *375 mortgagor's default on that debt.[9] Once the debt and default have been established, the mortgagor has the burden of establishing a defense to foreclosure such as lack of consideration, payment, or accord and satisfaction. See Bandy v. Bandy, 187 S.C. 410, 413, 197 S.E. 396, 397 (1938) (holding the burden was on defendant in mortgage foreclosure suit to establish her defense that mortgage and note secured thereby were without valuable consideration by preponderance of evidence).
In the present case, the master-in-equity concluded Bank failed to carry its burden of proving the second lump sum payment was due in November 2002, and also accepted the terms of the reinstatement agreement as asserted by Mr. Bell. However, taking our own view of the preponderance of the evidence, we respectfully disagree, and find that the preponderance of the evidence in the record establishes default.
Stokes testified that the reinstatement agreement between Bank and the Bells provided the following: (1) the Bells would make the first lump sum payment of $30,000 immediately (August 2002); (2) the Bells would make a second lump sum payment of $37,570.85 in ninety days (November 2002); and (3) the Bells' monthly payments on the mortgage would increase to $2,134.52 beginning in September. Stokes corroborated her testimony with several entries in the FORTRACS system, which she contemporaneously made after telephone *376 conversations with the Bells. Furthermore, Stokes also testified that she was without authority to extend the time for repayment beyond the ninety days allegedly agreed to in the reinstatement agreement.
The master-in-equity relied on a contradictory notation in Bank's FORTRACS system indicating the loan was fully reinstated as of February 7, 2003, which, upon a cursory review, corroborated Mr. Bell's testimony. Notwithstanding, Stokes explained the alleged discrepancy in her testimony:
Back in 2002 FORTRACS was a new system that we received, and it was still in a tweaking process and back then when we wanted a file to go back to collections . . . and sent to a new foreclosure, we had to close it out of this system, and that was the only way of closing out is to put loan reinstated or loan paid off and we didn't want to put loan paid off, so we used reinstated so it can go back to the proper channels to be referred back to a foreclosure attorney.
Nothing in the record was presented to dispute this explanation. Moreover, the master-in-equity failed to consider that even the Bells were not asserting that the loan was fully reinstated as of February 2003. Under the Bells' own version, the loan would not have been current until August 2003. Stokes' explanation for the irregularity demonstrates that the entry actually conforms to Bank's position on the default. In fact, Stokes further testified that this action was the necessary entry to make in the FORTRACS system at that time for all accounts being referred to an attorney for collection.
Further, Mr. Bell agreed with several statements made by Stokes. For example, Mr. Bell acknowledged having numerous telephone conversations with Stokes over "the next couple of months" regarding the agreement and to "get the numbers together . . . ." Moreover, although Mr. Bell denied having told Stokes the full amount of the balance due would be paid in November 2002 or December 2002, he conceded he never tendered the second lump sum payment. Consequently, Bank took the positive steps necessary to foreclose on the Bells' account due to the Bells' failure to timely pay the second lump sum under the reinstatement agreement. Therefore, a finding *377 of default based on the missed second lump sum payment is supported by the record.
Additionally, as the master-in-equity determined in his findings of fact, the Bells missed their regular monthly payments in December 2002 and January 2003 after the reinstatement agreement was entered.[10] These missed payments each constitute a default by the Bells.[11]
The letters sent from Bank to the Bells rejecting attempted monthly payments, beginning with the February 2003 payment, support Bank's position on default. Bank never sent a rejection of payment letter prior to February 2003. Once the Bells were deemed to be in default because of the missed November 2002 lump sum payment, or by virtue of the missed December 2002 and January 2003 monthly payments, Bank was under no obligation to accept any monthly payments in February or thereafter; moreover, Bank's legal right to declare the entire balance due and right to commence a foreclosure action could not be taken away or nullified by a partial tender.[12]See Allendale Furniture Co. v. Carolina Commercial *378 Bank, 284 S.C. 76, 79, 325 S.E.2d 530, 531 (1985); Dargan v. Metro. Props., Inc., 243 S.C. 324, 325, 133 S.E.2d 821, 823 (1963); see also Ford Motor Credit Co. v. Morales, 279 S.C. 388, 390, 308 S.E.2d 102, 102 (1983) ("A payment of a debt is not considered made until it is accepted by the creditor with the intention of extinguishing the debt."). Each letter sent by Bank rejecting an attempted monthly payment shows that the sum tendered was less than the total amount due on its account to cure the default.
Notwithstanding a technical default, the Bells contend that they are excused from making payments because they tendered monthly payments and the payments were improperly rejected. The master-in-equity concluded that the Bells were absolved from tendering the second lump sum payment because such an act would be useless or futile in light of Bank's rejection of the Bells' monthly payments between February 2003 and August 2003. This conclusion was based upon his finding that the due date for the second lump sum payment was August 2003. However, because we find the second lump sum payment was due in November 2002, rather than August 2003, Bank was under no obligation to accept any payments made by the Bells short of the amount required to satisfy the debt. See Allendale Furniture Co., 284 S.C. at 79, 325 S.E.2d at 531; Dargan, 243 S.C. at 325, 133 S.E.2d at 823. Moreover, we do not find credible the Bells' assertion that the Bank's rejection of payments since February 2003 justified their failure to tender the lump sum payment in August 2003; notwithstanding this position, the Bells continued making monthly payments until October 2005. Similarly, because the Bells missed the monthly payments in December 2002 and January 2003, Bank's lawful rejection of any payments subsequent to the default arising from these missed monthly payments may not be asserted as a defense against Bank. Accordingly, we find the useless or futile act doctrine does not apply to the factual circumstances of this case, and we reverse this determination.
Bank also asserts the master-in-equity erred in ruling it was not entitled to collect interest accrued on the loan. We *379 agree. As previously indicated, the parties agree the only term disputed regarding the reinstatement agreement was the date the second lump sum payment was due. Nowhere in the record or briefs have the parties indicated the reinstatement agreement touched upon the issue of interest. As such, the underlying Note controls the issue of interest.
The construction of a clear and unambiguous contract presents a question of law for the court. Ward v. West Oil Co., 379 S.C. 225, 238, 665 S.E.2d 618, 625 (Ct.App.2008); see also Pruitt v. S.C. Med. Malpractice Liab. Joint Underwriting Ass'n, 343 S.C. 335, 339, 540 S.E.2d 843, 845 (2001). We are without authority to alter an unambiguous contract by construction or to make new contracts for the parties. C.A.N. Enters., Inc. v. S.C. Health & Human Servs. Fin. Comm'n, 296 S.C. 373, 378, 373 S.E.2d 584, 587 (1988). "A court must enforce an unambiguous contract according to its terms regardless of its wisdom or folly, apparent unreasonableness, or the parties' failure to guard their rights carefully." S.C. Dept. of Transp. v. M & T Enters. of Mt. Pleasant, LLC, 379 S.C. 645, 655, 667 S.E.2d 7, 13 (Ct.App.2008).
In the present case, the Note provides that interest will be charged at a yearly rate of nine percent on unpaid principal until the full amount of the principal has been paid. Moreover, "[t]he interest rate required by this Section 2 is the rate [Mortgagor] will pay both before and after any default described in . . . this Note." Thus, under the plain and unambiguous terms of the Note, Bank is entitled to interest accrued on the unpaid principal before and after the Bells defaulted. Accordingly, we reverse the order regarding interest and remand to the master-in-equity for calculation of the Bells' debt to Bank consistent with the terms of the Note.
Bank asserts the master-in-equity erred in ruling Bank was not entitled to recover attorney's fees incurred in attempting to collect the loan. Because we find the Bells were in default, we agree.
"The general rule is that attorney's fees are not recoverable unless authorized by contract or statute." Baron Data Sys., Inc. v. Loter, 297 S.C. 382, 383, 377 S.E.2d 296, 297 (1989) (citing Hegler v. Gulf Ins. Co., 270 S.C. 548, 243 S.E.2d 443 (1978)). "Where there is a contract, the award of attorney's *380 fees is left to the discretion of the trial judge and will not be disturbed unless an abuse of discretion is shown." Id. (citations omitted). Here, the contract between the parties provided for reasonable attorney's fees and costs in the event of default. Accordingly, we reverse the master-in-equity's denial of attorney's fees to Bank and remand the issue to the master-in-equity for reconsideration and an appropriate award of attorney's fees. See Sexton v. Sexton, 310 S.C. 501, 503, 427 S.E.2d 665, 666 (1993) (reversing and remanding issue of attorney's fees for reconsideration when the substantive results achieved by trial counsel were reversed on appeal).

CONCLUSION
We note the increased filing of cases requesting foreclosure in this State. Many people have been affected by the economy and currently face the unfortunate specter of foreclosure. While we acknowledge the hardship our decision may create, we also recognize the court's limited role in giving effect to the contractual agreement between the parties.
Accordingly, based upon our analysis herein, we reverse and remand the case to the master-in-equity for further proceedings in accordance with this opinion.
REVERSED AND REMANDED.
HEARN, C.J., and LOCKEMY, J., concur.
NOTES
[1] FORTRACS History Notes is a system banks use to document the activity on an account, including payments, arrangements, conversations, or any other activity on the account. Activity supposedly is documented at the time the work is completed. Stokes testified only important conversations and arrangements were recorded.
[2] The asserted defenses included the following: (1) failure to state a claim upon which relief could be granted; (2) waiver, estoppel, laches and/or unclean hands; (3) statute of limitations; (4) accord and satisfaction; (5) intervening acts by Bank; and (6) payment.
[3] The Bells' June 2005 monthly payment was the lone exception wherein Bank retained the funds.
[4] At trial, Mrs. Bell abandoned her interest in the counterclaims asserted against Bank.
[5] Section 2 of the Note reads:

Interest will be charged on unpaid principal until the full amount of the principal has been paid. [Mortgagor] will pay interest at a yearly rate of 9.000 [percent]. The interest rate required by this Section 2 is the rate [mortgagor] will pay both before and after any default described in . . . this Note.
[6] While we do not necessarily agree that the master-in-equity had the authority to restructure the missed payments over the term of the loan, we need not reach this issue in light of our disposition herein and because this issue is not properly preserved for our review.
[7] We granted Bank's motion to supplement the Record on Appeal to include the post trial memoranda and post trial hearing transcript. We also note Bank never filed a Rule 59(e) motion.
[8] As indicated in their respective briefs, both parties agree that this case is governed by the equitable standard of review.
[9] See, e.g., Franklin Credit Mgmt. Corp. v. Nicholas, 73 Conn.App. 830, 812 A.2d 51, 57-58 (2002) ("In a mortgage foreclosure action, to make out its prima facie case, the foreclosing party had to prove by a preponderance of the evidence that it was the owner of the note and mortgage and that the [defendant] had defaulted on the note.") (internal quotations omitted) (internal citations omitted); Campaign v. Barba, 23 A.D.3d 327, 805 N.Y.S.2d 86, 86 (N.Y.App.Div.2005) ("To establish a prima facie case in an action to foreclose a mortgage, the plaintiff must establish the existence of the mortgage and mortgage note, ownership of the mortgage, and the defendant's default in payment."); In re Foreclosure of Real Prop. for $143,600.00, 156 N.C.App. 477, 577 S.E.2d 398, 406 (2003) ("In a foreclosure proceeding, the lender bears the burden of proving that there was a valid debt, default, right to foreclose under power of sale, and notice."); 55 Am. Jur. 2d Mortgages § 604 ("[T]he burden of proof of any particular issue rests upon the party asserting the affirmative of that issue under the pleadings."); cf. Paramount Fund, Inc. v. Cusaac, 282 S.C. 497, 499, 319 S.E.2d 354, 355 (Ct.App.1984) (holding the mortgagee has the burden of proving a disputed mortgage by the preponderance of the evidence).
[10] Although the Bells' Rule 59(e) motion challenged whether Mr. Bell admitted to missing their December 2002 and January 2003 monthly payments, we note that the master-in-equity's supplemental order did not address the Bells' missed monthly payments. Instead, the supplemental order explicitly stated that the first order remained in full force and effect in all respects, except as specifically modified by the supplemental order. Moreover, while we agree the record does not indicate an admission of this fact by the Bells, the record nonetheless supports a finding that the payments were missed based on the direct testimony of Stokes on this issue.
[11] Even if our view of the preponderance of the evidence as to the due date of the second lump sum payment in November 2002 is incorrect, the missed December 2002 and January 2003 payments each independently establish a default. Once default occurs by virtue of these missed monthly payments, the reinstatement agreement conflict as to the second lump sum payment is no longer controlling as the balance owed on the note is accelerated, and Bank is entitled to foreclose based on that default.
[12] Bell testified Bank accepted one monthly payment for June 2005, and further testified to "know of two others that [were] cashed and then a bank check was sent back" to him; however, we note these acts do not constitute a waiver of Bank's rights to acceleration and foreclosure. See Caulder v. Lewis, 287 S.C. 372, 375, 338 S.E.2d 837, 839 (1986) (holding one or two late payments accepted after default do not establish waiver, and acceleration of the debt may still be exercised).